PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 18-3327

_____

In re: NATIONAL COLLEGIATE STUDENT LOAN
TRUSTS 2003-1, 2004-1,
2004-2, 2005-1, 2005-2, 2005-3

*Waterfall Asset
Management, LLC,
One William Street Capital
Master Fund, Ltd., OWS
Credit Opportunity I, LLC,
OWS ABS Fund II, L.P. and
OWS COF 1 Master, L.P.,
                    Appellants

*(Pursuant to Rule 12(a) Fed. R. App. P.)

_____

No. 18-3328

_____

In re: NATIONAL COLLEGIATE STUDENT LOAN
TRUSTS 2003-1, 2004-1,
2004-2, 2005-1, 2005-2, 2005-3

U.S. Bank National Association,
Indenture Trustee,

                                                 Appellant

———————

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 1-16-cv-00341)
District Judge: Honorable Joseph F. Bataillon
Magistrate Judge: Honorable Sherry R. Fallon

———————

Argued March 11, 2020

Before: McKEE, AMBRO, and PHIPPS, <u>Circuit Judges</u>

(Opinion filed:  August 19, 2020)

Michael Hanin (Argued)
Uri Itkin
Kasowitz Benson Torres
1633 Broadway, 21st Floor
New York, NY  10019

Henry B. Brownstein
Kosowitz Ben Torres
1399 New York Avenue, Suite 201
Washington, DC  20005

Andrew D. Cordo
Ashby & Geddes, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150

Wilmington, DE  19899

       Counsel for Appellants
       Waterfall Asset Management LLC,
       One William Street Capital Master Fund Ltd.,
       OWS Credit Opportunity I LLC,
       OWS ABS Fund II LP, OWS COF I Master LP

Jeffrey T. Castellano
John W. Shaw
Shaw Keller
1105 North Market Street
I.M. Pei Building, 12th Floor
Wilmington, DE  19801

Louis Chaiten
James R. Saywell
Jones Day
901 Lakeside Avenue
North Point
Cleveland, OH  44114

Keith Kollmeyer
Matthew Martel (Argued)
Anthony Masero
Joseph B. Sconyers
Jones Day
100 High Street
Boston, MA  02110

       Counsel for Appellant
       US Bank NA, as Indenture Trustee

Daniel L. Berger
Charles T. Caliendo
James J. Sabella
Grant & Eisenhofer
485 Lexington Avenue, 29th Floor
New York, NY  10017

Kimberly Evans (Argued)
Michael T. Manuel
Grant & Eisenhofer
123 Justison Street, 7th Floor
Wilmington, DE  19801

        Counsel for Appellees

_____

OPINION  OF  THE  COURT

_____

AMBRO, <u>Circuit Judge</u>

        Six Delaware statutory trusts (the "Trusts") acquired student loans, issued notes for those acquisitions, and pledged the student loans as collateral for the notes.  This process, called a securitization, works well when the students do not default on their loans.  When they do, a servicer of the loans attempts to collect.  If that servicer comes up short, there is a problem.  That is what occurred here.  To remedy the problem and aid collection, an additional servicer was added by the owners of the Trusts.  May this be done under the documents for the securitization and, if so, were the requirements in those documents followed?  To flesh out this dispute, what follows

is a Reader's Digest version followed by a more complete factual and procedural background.

Each Trust stems from a trust agreement (the "Trust Agreement") pursuant to the Delaware Statutory Trust Act. Del. Code Ann. tit. 12, § 3801(g). The Trusts issued notes (the "Notes") entitling their holders (the "Noteholders") to the income from the student loans purchased with Note proceeds. To secure the Notes, the Trusts pledged the student loans under a "Granting Clause" in documents called "Indentures" entered into with U.S. Bank National Association ("U.S. Bank"), as Indenture Trustee.

The Indentures also contain various protections for the benefit of the Indenture Trustee and the Noteholders, including a requirement that the Trusts obtain consent from the Indenture Trustee and the Noteholders to amend, supplement, or terminate the Indentures (the "Consent Clause").

The Trusts initially did not provide for servicing loans delinquent in their payments. They later entered into a "Special Servicing Agreement" to do so. U.S. Bank became both the Indenture Trustee and the "Special Servicer" under the Special Servicing Agreement. It is here our dispute begins.

U.S. Bank allegedly failed as the Special Servicer to collect hundreds of millions of dollars in delinquent loans. To mitigate losses, holders of the equity ownership interests in the Trusts (the "Owners") sought to hire an additional loan servicer, and ultimately entered into an agreement for Odyssey Education Resources, LLC ("Odyssey") to serve in that role (the "Odyssey Agreement"). Thereafter the Trusts submitted invoices from Odyssey for payment from the trust estate.

The parties dispute whether the Trusts had the right to enter the Odyssey Agreement and whether that Agreement

conflicts with the "Basic Documents," meaning the Indentures, the Trust Agreements, along with the Servicing Agreements, and other related agreements. On cross-motions for summary judgment, the District Court held that: (1) the Trusts did not violate the Granting Clause by hiring Odyssey and retaining the right to hire a new servicer; (2) the Trusts were not required to obtain consent to hire Odyssey because the Odyssey Agreement did not waive, amend, modify, supplement, or terminate any of the terms of the Basic Documents; (3) Odyssey's invoices were accordingly payable; and (4) the question whether the Odyssey Agreement was the result of improper self-dealing was irrelevant. *U.S. Nat'l Bank Ass'n v. Nat'l Collegiate Student Loan Tr. 2003-1*, No. 16-cv-341, 2018 WL 4462369 (D. Del. Sept. 18, 2018).

We affirm in part and reverse in part. We agree that the Granting Clause does not bar the Trusts from appointing an additional servicer, yet we also hold that several provisions of the Odyssey Agreement violate the Granting Clause by impermissibly transferring to the Owners of the Trusts rights reserved for the Indenture Trustee. We also part with the District Court and hold that the Odyssey Agreement supplements and modifies several provisions of the Basic Documents, thus requiring consents not obtained from the Indenture Trustee. Accordingly, the Odyssey Agreement is invalid, and we remand to the District Court to determine whether the Odyssey invoices are nonetheless payable (which may include a re-look at the self-dealing issue).

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Creation, Structure, and Basic Documents of the Trusts

The Trusts (National Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, and 2005-3) were

created between 2003 and 2005.  Their purpose was to acquire student loans by issuing notes and executing indentures, to provide for administration of the Trusts and servicing of the student loans, and to enter into other necessary agreements to achieve the foregoing.  Trust Agreement ("TA") § 2.03(a), J.A. 267–68.

The Trust Agreements appointed an owner trustee (the "Owner Trustee") to act for and manage the affairs of each Trust.  The Owner Trustee in turn appointed an administrator (the "Administrator") to aid it in discharging its duties and to take certain actions under an administration agreement (the "Administration Agreement").   GSS Data Services Inc. ("GSS") initially served as Administrator.  J.A. 148–49.

To fund the acquisition of the student loans, the Trusts issued Notes to the Noteholders.  The Notes are backed by the loans and are paid through principal and interest payments received from the student loan borrowers.

Appellants are the Noteholders,[1] and U.S. Bank, which serves as the current Indenture Trustee for the Trusts (together "Appellants").  The Indentures are governed by New York law. *See* Indenture § 11.13, J.A. 384.

The Administration Agreements were entered into on various dates by and among each of the Trusts, Wilmington Trust Company ("Wilmington Trust") as Owner Trustee, U.S. Bank as Indenture Trustee, The National Collegiate Funding

---

[1] The interested Noteholders (participating in this suit) are Waterfall Asset Management, LLC, One William Street Capital Master Fund, Ltd., OWS Credit Opportunity I, LLC, OWS ABS Fund II, L.P., and OWS COF I Master, L.P.  The Noteholders and U.S. Bank initially brought separate appeals that are herein consolidated.

LLC as the Depositor, and First Marblehead Data Services, Inc. ("First Marblehead Data") as Administrator under each Administration Agreement.

Under the Indentures, the Trusts granted all of the right, title, and interest in and to, among other things, the student loans held by the Trusts, the related agreements, funds and accounts, and all related present and future claims related thereto (collectively, the "Indenture Trust Estate") to the Indenture Trustee for the benefit of the Noteholders.

The Granting Clause, under which the Trusts grant their interest in the student loans to the Indenture Trustee, provides in relevant part:

> The Issuer [*i.e.*, the Trust] hereby Grants[2] to the Indenture Trustee at the Closing Date with

---

[2] The Indenture defines "Grant" in a litany of legal jargon meant to be very broad:

> "Grant" means mortgage, pledge, bargain, sell, warrant, alienate, remise, release, convey, assign, transfer, create, and grant a lien upon and a security interest in and right of setoff against, deposit, set over and confirm pursuant to the Indenture.  A Grant of the Collateral or of any other agreement or instrument shall include all rights, powers and options (but none of the obligations) of the Granting party thereunder, including the immediate and continuing right to claim for, collect, receive and give receipt for principal and interest payments in respect of the Collateral and all other moneys payable thereunder, to give and receive notices and other

respect to the Initial Financed Student Loans, and as of each Subsequent Transfer Date with respect to Subsequent Loans acquired as of such date, as trustee for the benefit of the holders of the Notes, all the Issuer's right, title and interest in and to the following:

(a) the Student Loans, and all obligations of the Obligors thereunder including all moneys paid thereunder on or after the Cutoff Date . . . ;

(b) all Servicing Agreements and all Student Loan Purchase Agreements, including the right of the Issuer to cause the Sellers to repurchase[,] or the Servicer to purchase, Student Loans from the Issuer under circumstances described therein; . . . .

Indenture at 1–2, J.A. 317–18.  It is "absolute."  Indenture § 3.07(f), J.A. 336.

To protect the Noteholders' interests, the Indentures include "Issuer Separateness Covenants" that impose on the Trusts obligations to "maintain an arm's length relationship with . . . any of the [Trusts'] Affiliates."  Indenture § 3.23(l),

---

communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the Granting party or otherwise and generally to do and receive anything that the Granting party is or may be entitled to do or receive thereunder or with respect thereto.

Indenture, App. A-16, J.A. 406.

J.A. 346.  So long as the Notes are outstanding, the Trusts must "avoid the appearance [] of conducting business on behalf of any Owner or any Affiliate of an Owner."  TA § 2.03(b)(iv), J.A. 268.  In addition, the Indentures require the consent of Noteholders and the Indenture Trustee in order to "waive, amend, modify, supplement or terminate" any of the Basic Documents.  Indenture §§ 3.07(c), (f), J.A. 336–37.

## B.    Special Loan Servicing Agreements

At the Trusts' inception, the Pennsylvania Higher Education Assistance Agency ("PA Education Agency") acted as the sole Servicer for each Trust pursuant to a servicing agreement (the "PA Education Agency Servicing Agreement").  Under it, the PA Education Agency serviced performing, or up-to-date, student loans and could purchase those loans out of the Trusts but only for "an amount equal to the principal balance and accrued and unpaid interest."  J.A. 605, 740.

The Basic Documents at the outset did not provide for servicing loans delinquent in their payments because The Educational Resources Institute Inc. (the "Resource Institute") guaranteed full repayment on those loans.  After that entity's bankruptcy in 2008, however, the Trusts established a regime for servicing delinquent student loans.  Specifically, in 2009 the Trusts entered into a "Special Servicing Agreement" for the purpose of servicing two categories of non-performing student loans, "Defaulted Loans" and "Delinquent Loans."  J.A. 428.

The Special Servicing Agreement was entered into by and among First Marblehead Education Resources, Inc. ("First Marblehead Education") and each of the Trusts, which named First Marblehead Education as Special Servicer for delinquent and defaulted loans (hereinafter referred to as "Defaulted Loans").  The Special Servicing Agreement provided that U.S.

Bank was the "Back-up Special Servicer," and that if First Marblehead Education were to resign as Special Servicer, U.S. Bank would replace it.  J.A. 428.

The Special Servicing Agreement further provided that Defaulted Loans are serviced exclusively by the Special Servicer.  Amendments to the Special Servicing Agreement had to be agreed to by parties other than the Trust, including the Special Servicer, and U.S. Bank (as Indenture Trustee) and the Administrator.  Special Servicing Agreement ("SSA") § 16, J.A. 442.  For the Trusts to replace the Special Servicer, they were required to provide prior written notice to the rating agencies Moody's Corp., S&P Global Ratings, and Fitch Ratings Inc., (collectively, the "Rating Agencies"), and receive written confirmation that the proposed successor would not result in a reduction or withdrawal of the Notes' then-current ratings (the "Special Servicing Agreement Rating Agency Condition").  SSA § 6(E), J.A. 433; *see also* Indenture, Definitions, J.A. 414 (instructing that "each Rating Agency shall have been given 10 days' prior notice thereof . . . [,] and that none of the Rating Agencies shall have notified the Administrator or the Indenture Trustee[] in writing that such action will in and of itself result in a reduction or withdrawal of the then current rating of the Notes . . . ." (the "Indenture Rating Agency Condition")).

In 2012, First Marblehead Data was sold, and shortly thereafter First Marblehead Education resigned as Special Servicer.  U.S. Bank then became Special Servicer.

## C.     The Trusts Hire Odyssey

The Trusts allege that since U.S. Bank took over as Special Servicer over $1 billion of loans have become uncollectable due to the expiration of the relevant statute of limitations and over $4 billion of loans have defaulted.  The

Trusts are paying servicing fees in excess of any revenues they can collect on the Defaulted Loans.

In addition, lawsuits filed by U.S. Bank on behalf of the Trusts against borrowers for collection on Defaulted Loans were dismissed due to faulty documentation and procedures, and subsequently the Trusts were sued in both class action suits and by individuals for illegal collection practices.

To mitigate losses, the Owners sought to hire an additional loan servicer.  In 2014 they entered an agreement for Odyssey to act as a Servicer for each Trust's Loans.  Odyssey Agreement ("OA"), J.A. 490–500.

At inception the Owners of the Trusts were the National Collegiate Funding LLC, a depositor and sponsor of the securitizations, and the Resource Institute.  In 2014, at the time of the Odyssey transaction, the beneficial owners of the Trusts were an affiliate of Citibank named SL Resid Holdings, LLC ("Citibank") and an affiliate of VCG Securities, LLC ("VCG") named NC Owners, LLC.  VCG was the authorized representative of the Owners in connection with the Odyssey transaction.  At the time of the Odyssey Agreement, Odyssey had two members, VCG and Boston Portfolio Advisors, Inc. The latter resigned in 2017, leaving VCG as the sole member of Odyssey.[3]

---

[3] Appellants point out that VCG is now the majority equity owner of the Trusts and the only owner of Odyssey. This arguably leaves one entity doing the pooling and the servicing of the student loans.

The Trusts counter that U.S. Bank is the party with a "substantial conflict[] of interest" here "given its dual roles as Indenture Trustee and Special Servicer . . . ."  Appellees' Br.

When the Owners decided to hire an additional loan servicer, they sent letters to the Rating Agencies informing them about the Odyssey Agreement.  None of the agencies expressed that hiring Odyssey would cause a downgrade.  After more than 10 days had passed from the time the Rating Agencies were notified of the Trusts' intention to hire Odyssey, the Owners directed Wilmington Trust to execute the Odyssey Agreement and notify GSS (as Administrator) and U.S. Bank (as Indenture Trustee) of that action.

The Trusts thereafter asked U.S. Bank to acknowledge Odyssey's hiring.  Under Section 11.01 of the Indentures, if the Issuer (*i.e.*, a trust) requests that the Indenture Trustee (U.S. Bank) take any action, the Issuer must provide "the Indenture Trustee (i) an Officers' Certificate of the Issuer stating that all conditions precedent . . . relating to the proposed action have been complied with and (ii) an Opinion of Counsel stating" as much.  J.A. 380.  On January 14, 2016, per the requirements of Section 11.01, Wilmington Trust sent an Officers' Certificate of Issuer and an opinion letter to U.S. Bank.  It, however, refused to acknowledge Odyssey's retention.

### D.    The Odyssey Agreement

Under the Odyssey Agreement, Odyssey is to service "Defaulted Loans" and "Loans Eligible For Sale."  OA at 1, § 2(B), J.A. 491.  Odyssey has the authority to purchase certain defaulted Loans from the Trusts.

---

2.  They posit that, "[a]s Special Servicer, U.S. Bank receives a fee based on the total outstanding Loan balances . . . [.]  To the extent hiring Odyssey will result in Loans being sold, this will reduce the fees to which U.S. Bank would otherwise be entitled."  *Id.*

The Noteholders and U.S. Bank, as Indenture Trustee, allege that VCG has sought to transfer servicing of newly Defaulted Loans from the Special Servicer (U.S. Bank) to Odyssey.

One of the main disputes before us is whether the Odyssey Agreement unilaterally, and thus impermissibly, amended the Basic Documents. The parties disagree as to what extent the Odyssey Agreement and the Special Servicing Agreement are incompatible.

For example, Appellants (U.S. Bank and the Noteholders) argue that the Special Servicing Agreement does not permit sales of loans. The Odyssey Agreement authorizes Odyssey to purchase Defaulted Loans at a "purchase price" that is 10% less than fair market value of the Defaulted Loan (put differently, to retain a 10% commission for arranging for the sale of the Loan). OA § 2(C), J.A. 492–93. Appellees (the Trusts) point to several sections of the Indentures to argue the Basic Documents, including the Special Servicing Agreement, do allow the sale of loans. Section 3.14 permits the Indenture Trustee to dispose of Loans to three parties: a guarantor, a seller, and a servicer. Indenture § 3.14, J.A. 340. Loans sold to the Servicer must be at a "price [] equal to or in excess of the amount required by the applicable . . . Servicing Agreement . . . ." Indenture § 3.14(b), J.A. 340. The Special Servicing and Odyssey Agreements also arguably vary in several other respects:

- The Special Servicing Agreement allows the Indenture Trustee to remove the Special Servicer for cause *without* the consent of the Trusts. SSA § 6(D), J.A. 432–33. The Odyssey Agreement allows for the removal of Odyssey for cause only "*with* the prior written consent of the Trust." OA § 6(C), J.A. 494 (emphasis added).

- Amendments to the Special Servicing Agreement require the consent of the Administrator. SSA § 16, J.A. 442. The Odyssey Agreement requires the Trusts to consent to any amendments to the Odyssey Agreement. OA § 15, J.A. 497.

- The Special Servicing Agreement provides that the Indenture Trustee and other transaction parties shall be indemnified by the Special Servicer for liability arising from "willful misconduct, negligence or bad faith," SSA, § 10, J.A 441, whereas the Odyssey Agreement provides indemnification for only "willful misconduct, *gross* negligence or bad faith," OA § 9, J.A. 496 (emphasis added).

- The Basic Documents did not permit dealings with affiliates. TA § 2.03(b)(iv), J.A. 268. The Odyssey Agreement permits Odyssey to "enter into transactions or otherwise deal with any of its affiliates." OA § 5(B), J.A. 494.

## E.    The Unpaid Invoices

In December 2015, the Trusts submitted more than $1.24 million in invoices from Odyssey for payment from the Indenture Trust Estate. Odyssey performed services such as conducting audits and other work to evaluate which Defaulted Loans could be sold. GSS, as Administrator, refused to process the invoices and requested additional information. It sent the invoices to U.S. Bank as Indenture Trustee, complaining that no documentation was provided for the alleged expenses.

### F.   Procedural History

In February 2016, U.S. Bank sought instruction from a Minnesota state court on (1) whether Odyssey was properly appointed as a servicer, (2) whether the Odyssey Agreement is invalid because it would amend or modify the Basic Documents, and (3) whether the invoices submitted by Odyssey for services should be paid.

The Trusts removed the case to the United States District Court for the District of Minnesota.  Thereafter, the parties stipulated to transferring the case to the United States District Court for the District of Delaware.  After discovery, the parties filed cross-motions for summary judgment.

The Magistrate Judge issued a Report and Recommendation ("R&R"), recommending that the District Court grant the Trusts' motion for summary judgment, deny U.S. Bank's motion, and order that the Odyssey invoices be paid.  The Magistrate Judge found that: (1) under Section 2.03 of the Indentures, the Trusts have the power "to enter into such agreements that are necessary, suitable or convenient" to administer the Trusts and service the loans, and that no other relevant agreement establishes "an exclusive arrangement pursuant to which the Trusts forfeited their right . . . to enter into other servicing agreements," J.A. 38; (2) the Odyssey Agreement does not waive, amend, or terminate the terms of the Basic Documents because, *inter alia*, Section 3.14 of the Indentures specifically allows for the sale of loans to a servicer and there is no conflict between the Odyssey Agreement and the Special Servicing Agreement; and (3) the Trusts satisfied the applicable Indenture Rating Agency Condition.  The Magistrate found that VCG and Odyssey's alleged self-dealing were not dispositive of the issues.

U.S. Bank and the Noteholders filed objections to the R&R. The Trusts contend that most of their objections raised new arguments not presented before the Magistrate Judge, including that the Granting Clause precluded the Trusts from hiring Odyssey.

The District Court essentially adopted the R&R in its entirety and held that arguments not presented to the Magistrate Judge were waived. *U.S. Nat'l Bank Ass'n*, 2018 WL 4462369.

## II.    JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1332, 1348, 1441(b), and 1446. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

"The standard of review in an appeal from an order resolving cross-motions for summary judgment is plenary." *Cantor v. Perelman*, 414 F.3d 430, 435 n.2 (3d Cir. 2005). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"Under our case law, contract interpretation is a question of fact reviewed for clear error and contract construction is a question of law reviewed *de novo*." *Wayne Land & Mineral Grp. LLC v. Del. River Basin Comm'n*, 894 F.3d 509, 528 (3d Cir. 2018). Contract interpretation involves determining the meaning of the contract language and giving effect to the parties' intent. *See John F. Harkins Co., Inc. v. Waldinger Corp.*, 796 F.2d 657, 659 (3d. Cir. 1986). Construction of a contract goes beyond interpretation and requires determining the legal effect and consequences of contractual provisions. *Id.* (citing 3 Corbin, Corbin on Contracts § 534 at 9 (1960)); *see also Garden State Tanning*

*Inc. v. Mitchell Mfg. Grp., Inc.*, 273 F.3d 332, 335 (3d Cir. 2001) ("When an ambiguity exists in the agreement, the problem is one of interpretation. If, however, the terms are clear, construction of the contract determines its legal operation.").

"This case raises an issue of contract construction because the issue[s] on appeal do[] not require interpretation of any particular terms, but instead ask[] us to determine the legal effect of and interplay between various provisions" of the Basic Documents and the Odyssey Agreement. *Medtronic, Inc. v. Mirowski Family Ventures, LLC,* 682 F. App'x 921, 926 (Fed. Cir. 2017); *see also Ram Constr. Co. v. Am. States Ins. Co.*, 749 F.2d 1049, 1052–53 (3d Cir. 1984) (stating that a case raised issues of contract construction because the court had to assess how actions of the parties affected the initial agreement and whether a subsequent agreement was created). We thus apply a *de novo* standard of review.

Because the District Court adopted the Magistrate Judge's R&R in all material respects, we review the Magistrate Judge's proposed disposition of the case and treat it and the District Judge's order interchangeably. *See Shaver v. Siemens Corp.*, 670 F.3d 462, 470 (3d Cir. 2012).

## III.   DISCUSSION

### A.   The Odyssey Agreement Violates the Granting Clause.

Appellants argue that the Indentures' Granting Clause precluded the Trusts from appointing Odyssey as a new Servicer because its plain language assigned to the Indenture Trustee (U.S. Bank), for the benefit of the Noteholders, any right the Trusts may have previously had to appoint servicers. The Trusts counter that Appellants waived this argument

because they failed to raise it before the Magistrate Judge. Alternatively, they argue that the Trusts had the authority to appoint Odyssey under the plain language of the Basic Documents and they complied with all the requirements of the Basic Documents in entering the Odyssey Agreement.

We agree with the Appellants that the Odyssey Agreement violates the Granting Clause. However, we reach this conclusion not because the plain language of the Granting Clause prohibits the Trusts from appointing a new servicer, but rather because the Odyssey Agreement specifically assigned to the Owners of the Trusts several rights reserved for the Indenture Trustee, for the benefit of the Noteholders, in the Basic Documents.

### 1.    The Granting Clause Argument was not Waived.

We first address whether Appellants waived their argument that the Granting Clause precludes the Trusts from entering into the Odyssey Agreement.[4]    Arguments not presented to a magistrate judge and raised for the first time in objections to the magistrate's recommendations are deemed

---

[4] We note that forfeiture "is the failure to make the timely assertion of a right," or the "inadvertent failure to raise an argument," while waiver, in contrast, is the "intentional relinquishment or abandonment of a known right." *Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 147 (3d Cir. 2017) (citations and internal quotation marks omitted). Although "forfeiture" of arguments may be the applicable concept to describe Appellants' alleged failure to raise certain arguments here, we use "waiver" because the parties and District Court did and the Appellants' relevant arguments are not forfeited in any event.

waived. *See Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived."). A "passing reference to an issue" does not suffice to preserve it. *See Laborers' Int'l Union of N.A. v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994).

First, the Trusts misrepresent that the District Court held that the Granting Clause argument was waived. The Court in fact addressed this argument expressly by holding that "the granting clause does not preclude the trusts from appointing new servicers." *U.S. Nat'l Bank Ass'n*, 2018 WL 4462369, at *5. It recited the standard for waiver but did not hold that there was waiver. *Id.* at *4.

Second, the Trustees concede that the Noteholders argued to the Magistrate Judge "that the Odyssey Agreement violates the grant of the Indentures," yet posit that this was insufficient to preserve the issue because the argument was merely a "passing reference." Appellees' Br. 32. This too misrepresents the record. The Noteholders' submission to the Magistrate Judge devoted an entire section to the argument that the Odyssey Agreement "repudiates the Issuers' grant." J.A. 1024–25. The Judge expressly discussed the Granting Clause. And the Noteholders joined U.S. Bank's submissions on summary judgment, which included arguments that the Odyssey Agreement violated the Clause.

On this record, the Trusts cannot claim the Granting Clause argument surprised them. *Cf. Lark v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 596, 607 (3d Cir. 2011) (stating that "the crucial question regarding waiver" is whether the proceedings "put the [d]istrict [c]ourt on notice of the legal argument"). Moreover, even if Appellants had not clearly raised the argument, we have discretion to consider whether the Odyssey Agreement contravenes the Grant of the Indenture (something

we would do if needed), which presents a "pure question of law" "closely related to arguments that [the parties] did raise" and for which "[n]o additional fact-finding is necessary." *Bagot v. Ashcroft*, 398 F.3d 252, 256 (3d Cir. 2005). With no waiver, we thus proceed with Appellants' arguments.

### 2.     The Plain Language of the Grant of the Indenture Does Not Prohibit the Trusts from Appointing a New Servicer.

The Grant of the Indenture transferred to the Indenture Trustee (U.S. Bank), among other rights, "all the Issuer's right, title and interest in and to . . . the Student Loans, . . . [and] all Servicing Agreements . . . [,] including the right of the Issuer to cause . . . the Servicer to purchase[] Student Loans from the Issuer." Indenture at 1–2, J.A. 317–18. To restate, this was absolute.

Appellants contend that the right to appoint servicers is not shared; it was one of the rights absolutely granted to the Indenture Trustee, and under New York law an assignment of this breadth makes the trustee the exclusive holder of the rights assigned. *See Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, No. 14-cv-10116, 2015 WL 2359358, at *2 (S.D.N.Y. May 18, 2015) (stating that the grant of "all . . . right, title and interest" in the certificates and related claims constituted a "full assignment" that "divests plaintiffs of any rights they otherwise may have had to commence litigation on their own behalf" (citation and internal quotation marks omitted)); *House of Eur. Funding I Ltd. v. Wells Fargo Bank, N.A.*, No. 13-cv-519, 2015 WL 1472301, at *7 (S.D.N.Y. Mar. 30, 2015) (holding that granting clause effected "complete" assignment to trustee and rejecting contention that the clause was merely an "assignment as security" that reserved to the issuer any right to sue) (citation and internal quotation marks omitted).

The Trusts counter, and the District Court agreed, however, that "[t]he Granting Clause does not purport to divest the Trusts of their power and responsibility to appoint servicers. If that was the intention of the Granting Clause, it could have easily said so, but it did not." Appellees' Br. 34. The Court relied on *San Antonio Fire & Police Pension Fund v. Amylin Pharm., Inc*., 983 A.2d 304 (Del. Ch.), *aff'd*, 981 A.2d 1173 (Del. 2009) (applying New York law), which held that "[i]ndentures are to be read strictly[,] and to the extent they do not expressly restrict the rights of the issuer, the issuer is left with the freedom to act[.]" *Id.* at 314. Thus the Court concluded that "[t]here is no language presented to the court that takes away this right to appoint servicers." *U.S. Nat'l Bank Ass'n*, 2018 WL 4462369, at *5. It further pointed out that "[t]he granting rights clause does not use the language 'sole' or 'exclusive holder' when talking about the Indenture Trustee. Yet, when intended, the Indenture uses such words." *Id.* (citing Indenture § 6.10(b)(i)). And indeed, "[i]t is axiomatic [under New York law] that the powers of an indenture trustee are limited to those specifically articulated in the indentures themselves." *See Fleet Nat'l Bank v. Trans World Airlines, Inc*., 767 F. Supp. 510, 513 (S.D.N.Y. 1991).

The other cases Appellants cite to support that under New York law the Grant is absolute do not address whether a trust retains its right to appoint a servicer pursuant to an indenture. *See, e.g.*, *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 253 (2d Cir. 2018) (stating that the granting clause effected a "complete transfer" of the estate of trusts to an indenture trustee); *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, N.A*., 247 F. Supp. 3d 377, 412–13 (S.D.N.Y. 2017) (holding that owners of a trust had no right to control trust assets because the owners "contracted it away" to indenture trustee in the granting clause). Instead, they primarily involve residential mortgage-backed security ("RMBS") trusts, entities entirely distinct from

the Trusts at issue here. *See, e.g.*, *Triaxx Prime CDO 2006-1, Ltd. v. Bank of N.Y. Mellon*, No. 16-cv-1597, 2018 WL 1417850 (S.D.N.Y. Mar. 8, 2018) (involving RMBS trusts, not owner-directed Trusts, and addressing the plaintiff's right to sue, not whether it had the authority to appoint a new servicer); *Triaxx Prime CDO 2006-1, Ltd. v. Ocwen Loan Servicing, LLC*, 762 F.App'x 601, 605 (11th Cir. 2019) (same); *Nat'l Credit Union Admin. Bd.*, 898 F.3d at 253–54 (same); *BlackRock Allocation Target Shares*, 247 F. Supp. 3d at 411-12 (same); *Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, No. 14-cv-10116, 2016 WL 1169515, at *7 (S.D.N.Y. Mar. 22, 2016) (same).

More instructive here is the outcome in *Hildene Cap. Mgmt., LLC v. Bank of N.Y. Mellon*, 105 A.D.3d 436 (N.Y. App. Div. 2013). There the Court held that a granting clause similar to the one here did not deprive the issuers of notes of their right to enforce provisions of the indentures or other agreements. Plaintiffs, who were senior noteholders, alleged that Bank of New York Mellon ("BNYM"), as trustee, had improperly sold collateral securities. *Id.* at 437. Preferred Term Securities XX, Ltd. ("PreTSL XX"), as the issuer of the notes, moved to intervene, and the Court found it had standing to do so based on the contractual duties it assumed under the relevant indenture. *Id.* Specifically, in the granting clause, PreTSL XX granted its "right, title and interest" in the collateral securities to BNYM "for the benefit of itself and the Holders of the Notes" and "in trust . . . to secure compliance with the provisions of this Indenture . . . ." *Id.* at 438. However, Section 3.5 of the indenture authorized PreTSL XX to take action "necessary or advisable to: . . . preserve and defend title to the Collateral." *Id.* The Court held that it could not read the granting clause to divest PreTSL XX of the right to bring claims, for the benefit of itself and the noteholders, to recover damages for BNYM's alleged breach. *Id.*

The Trusts argue that, here too, they assumed certain contractual obligations under the Basic Documents that were not annulled by the Granting Clause. They assert they retain the obligation to take various actions to protect their interests and enforce the obligations of persons doing business with them. This includes the obligation "to enter into such agreements that are necessary" to "provide for . . . the servicing of the Student Loans." TA § 2.03(a)(ii) & (iii), J.A. 268. In addition, Section 3.07(d) of the Indentures provides:

> If the Issuer shall have knowledge of the occurrence of a Servicer Default . . . . , the Issuer shall promptly notify the Indenture Trustee and the Rating Agencies thereof, and shall specify in such notice the action, if any, the Issuer is taking with respect to such default . . . . [T]he Issuer shall take all reasonable steps available to it to enforce its rights under the Basic Documents in respect of such failure.

J.A. 336. And indeed the definition of "Grant" in the Indentures states that it is a conveyance of the "rights, powers and options . . . of the Granting party," J.A. 406, and it states as well that "none of the obligations" of the granting party are transferred thereunder, *id*.

As in *Hildene Capital Management,* 105 A.D.3d 436, reading the Granting Clause here to prevent the Trusts from hiring a new Servicer would render meaningless Sections 2.03(a)(ii) and (iii) of the Trust Agreements, and other rights and powers of the Trusts, including, *inter alia*, their right and power to hire, designate, and appoint the Special Servicer under each Trust's respective Indenture, Indenture § 2.03(a)(ii)–(iii), to direct audits on behalf of the Trusts, *id*. § 4.03(d), and to protect the Trusts and take action if they become aware of a servicer default, *id*. § 3.07(d).

It is a "cardinal rule of construction that a court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract . . . without force and effect.'" *Corhill Corp. v. S.D. Plants, Inc.*, 9 N.Y.2d 595, 599 (N.Y. 1961) (citations omitted). And where one interpretation of a contract provision would place it in conflict with another provision, courts are obliged to reconcile the provisions to give both effect. *Perlbinder v. Board of Mgrs. of 411 E. 53rd St. Condo.*, 65 A.D.3d 985, 987 (N.Y. App. Div. 2009). Holding that the Granting Clause prevents the Trusts from ever appointing a new servicer would render ineffective several provisions of the Basic Documents. Thus we decline to adopt such an interpretation.

Because the Granting Clause does not state that it divests the Trusts of their power and obligation to appoint servicers and because interpreting the Clause to do so would render several other provisions of the Basic Documents not effective, we hold that the Granting Clause does not categorically prohibit the Trusts from appointing another servicer.

This conclusion does not end our analysis, however. That the Trusts still have authority to appoint a new servicer does not mean that the Odyssey Agreement specifically does not violate the Granting Clause.[5]

---

[5] The Trusts also argue that Section 2 of the Special Servicing Agreement gives them the power to appoint the Special Servicer under each of the Trust's respective Indentures. They point out that U.S. Bank itself became the Special Servicer after signing the Special Servicing Agreement in March 2009 (years after the Indentures were executed), and that the Trusts previously entered into servicing agreements

### 3. The Odyssey Agreement Violates the Granting Clause by Reserving for the Trusts Rights Belonging to the Indenture Trustee for the Benefit of the Noteholders.

Appellants also countered that the Odyssey Agreement impermissibly reserved for the Trusts several rights that the Granting Clause conveyed to the Indenture Trustee, including, among others, the right to replace Odyssey for cause (Section 6(C)), and the right to direct Odyssey to act free from liability to the Indenture Trustee (Section 9).  J.A. 492, 494, 496.

We agree.  Under the Special Servicing Agreement, the Indenture Trustee "shall" remove the Successor Special

---

with different entities, such as the Master Servicing Agreement between the PA Education Agency and the First Marblehead Corporation in 2006.  According to the Trusts, just as they could enter the Special Servicing Agreement and the Master Servicing Agreement, they could enter the Odyssey Agreement.  This argument fails, however, because, with respect to the Special Servicing Agreement, U.S. Bank is not acting only as the Special Servicer; it also serves as the Indenture Trustee and its complaint about the Odyssey Agreement is that its rights as Trustee are being violated.  And that the terms of the Master Servicing Agreement and any other servicing agreement may not have violated the Basic Documents does not shield the Odyssey Agreement from criticism.  Appellants do not argue that those other agreements usurped the rights of the Indenture Trustee or included the kind of provisions the Odyssey Agreement includes.  Those agreements are substantively different from the Odyssey Agreement and not pertinent in our case.

Servicer upon the occurrence of certain specified defaults. SSA § 6.D, J.A. 432–33.  Odyssey, in contrast, cannot be removed for defaults under the Odyssey Agreement without consent of the Trusts.  OA § 6(C), J.A. 494.[6]  Likewise, under the Special Servicing Agreement the Indenture Trustee had a right to indemnity by the Special Servicer for liability traced to "willful misconduct, negligence or bad faith," SSA § 10, J.A.

---

[6] The Trusts claim that Section 6(C) cannot violate the Granting Clause because the Master Servicing Agreement gave First Marblehead Corporation the right to terminate the Master Servicing Agreement.  However, Appellants correctly point out that Section 6(C) is readily distinguishable from the rights granted to First Marblehead Corporation under the Master Servicing Agreement.  It expressly contemplated that First Marblehead Corporation's rights under that Agreement would be assigned to "Permitted Assignees" — *i.e.*, the Indenture Trustee, among others — as part of the original securitization process.  Master Servicing Agreement ("MSA") § 1.32, J.A. 742 (defining "Permitted Assignees" to include the Indenture Trustee); MSA §13.02(b), J.A. 771 (contemplating that rights of First Marblehead Corporation will be "assigned to Permitted Assignees"); MSA § 13.03, J.A. 771–72 ("all rights and obligations of [First Marblehead Corporation] under this Agreement with respect to [] Student Loans shall inure to . . . the Permitted Assignees").  Whatever termination rights First Marblehead Corporation had under the Master Servicing Agreement were ultimately granted to the Indenture Trustee. Moreover, the Master Servicing Agreement specifically states that "[n]othing contained herein shall be construed to create an exclusive arrangement . . . . The Servicer understands and agrees that [First Marblehead Corporation] may enter into other agreements for the servicing of Private Student Loans in the future."  MSA § 15.03, J.A. 776.

441, whereas the Odyssey Agreement provides indemnification for only "willful misconduct, *gross* negligence or bad faith," OA § 9, J.A. 496 (emphasis added).

We discuss in the next section how the Odyssey Agreement impermissibly modified and supplemented the Basic Documents. Some of those modifications were the same reassignment of rights from the Indenture Trustee to the Trusts discussed here. Whether we treat the relevant provisions of the Odyssey Agreement as impermissible reassignments of rights or unilateral modifications, they render the Odyssey Agreement invalid.

### B. The Odyssey Agreement Impermissibly Modified and Supplemented the Basic Documents Without Consent.

Although we hold that the Granting Clause does not divest the Trusts of their authority to appoint new servicers, we still must address Appellants' argument that the Indentures unambiguously require consent from the Indenture Trustee and the Noteholders for any amendment, supplement, or termination of the terms of the Basic Documents, and whether the Odyssey Agreement modified and supplemented the Basic Documents without that consent.[7]

---

[7] Our reading of the Granting Clause avoids the untenable outcome that the Trusts can never replace the servicer no matter how ineffectual it may be in performing its role (the accusation they direct at U.S. Bank). Holding that the Odyssey Agreement specifically violated the Granting Clause does not render the Trusts helpless. It allows them to appoint a new servicer. They just cannot do so in a way that violates the Basic Documents. For example, the Trusts conceivably

The parties do not contest that the Trusts did not obtain consent from the Indenture Trustee or the Noteholders before entering the Odyssey Agreement. The question thus devolves to whether that agreement impermissibly effected any modifications or supplements to the Basic Documents.

### 1. We Assess the Effect of the Odyssey Agreement on the Basic Documents to Determine Whether it Violated the Consent Clause of the Indentures.

Section 3.07(c) of the Indentures prohibits any alteration to the Special Servicing Agreement or other Basic Documents — specifically, any change that would "waive, amend, modify, supplement or terminate" them — "without the consent of the Indenture Trustee and the Interested Noteholders . . . ." Indenture § 3.07(c), (f), J.A. 336. The Special Servicing Agreement also prohibits any amendment without the consent of "the parties [thereto]" and "the Administrator;" any amendment must also satisfy the Rating Agency Condition; and any successor servicer must be approved by the Indenture Trustee and be affirmatively approved by the Rating Agencies. SSA §§ 6(E), 16, 22(A), J.A. 433, 442, 444.

We address first whether only formal alterations of the Basic Documents violate Section 3.07(c). The Trusts argue in essence, and the District Court agreed, that any agreement short of a formal modification cannot trigger the Consent Clause because Section 3.07(f) states that approval is required for anything that "amend[s], modif[ies], waive[s], supplement[s], terminate[s] or surrender[s] . . . *the terms* of . . . the Basic Documents," J.A. 336–37 (emphasis added), and the

---

could have entered another agreement that did not retain solely for the Trusts the right to hire and fire the servicer.

Odyssey Agreement did not make any actual modifications or additions to those terms. Applying a strict construction, the Court held that the Odyssey Agreement does not alter the terms of the Special Servicing Agreement or other Basic Documents. *U.S. Nat'l Bank Ass'n*, 2018 WL 4462369, at *5.[8]

We disagree and hold that the District Court's conclusion contravenes well-settled New York law. Under that law, parties to contracts cannot do anything that "'will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 631 (S.D.N.Y.) (quoting *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289 (N.Y. 1995)), *aff'd and remanded*, 381 F. App'x 117 (2d Cir. 2010) (per curiam). Courts look to the effect of a contractual action. In *Empresas*, for example, Cablevisión sought to enjoin its lender, JPMorgan, from selling a 90% "participation" in the loan (an action that did not require Cablevisión's consent under the credit agreement), arguing that the participation was in fact an "assignment" under the agreement (an action that did explicitly require Cablevisión's consent). 680 F. Supp. 2d at 626. The Court held that JPMorgan could not under the guise of selling a "participation"

---

[8] Appellees assert that Appellants waived several of their arguments as to how the Odyssey Agreement alters provisions in the Basic Documents. However, the Magistrate Judge specifically considered the modification argument, J.A. 47–49, even if not quite in the form presented before us. These arguments are thus not waived. *See United States v. Joseph*, 730 F.3d 336, 341 (3d Cir. 2013) (holding that while parties may not raise new arguments, they may place "greater emphasis and more fully explain an argument on appeal").

accomplish what was in substance a forbidden assignment. *Id*. at 631–32.

Here too the Trusts cannot circumvent Section 3.07(c) by entering a "new" agreement for the servicing of Defaulted Loans that achieves the same result as an amendment without obtaining the required consents. *See Penny Lane Owners Corp. v. Conthur Dev. Co*., No. 94-cv-940, 2000 WL 178189, at \*12 (S.D.N.Y. Feb. 16, 2000) (refusing to "exalt form over function" by treating a "lease" as an "assignment," "even if [the agreement] is not labeled so"); *In re LightSquared Inc*., 511 B.R. 253, 333 (Bankr. S.D.N.Y. 2014) (holding that party to credit agreement could not "end-run . . . the Eligible Assignee provisions of the Credit Agreement" by engaging in prohibited conduct through a shell company). *Cf. President & Fellows of Harvard Coll. v. Glancy*, No. 18790, 2003 WL 21026784, at \*14, 20 (Del. Ch. Mar. 21, 2003) (rejecting shareholder agreement that effectively amended a preexisting voting trust agreement without the required unanimous shareholder approval). Indeed, the Trusts concede that the purpose of the Odyssey Agreement was to remedy and replace the existing special servicing arrangement because of U.S. Bank's alleged poor collection practices.

Thus we assess whether the Odyssey Agreement had the effect of altering the Basic Documents even if there was no formal amendment. If the Odyssey Agreement is indeed an attempt to end-run the Consent Clause and modifies or supplements the Basic Documents without the consent of the Indenture Trustee and Noteholders, then it is invalid. We review each alleged modification or supplement in turn.

## 2.    Purchasing Loans from the Trust at Below-Market Value

Appellants assert that the Odyssey Agreement amends

the Basic Documents by giving a new power to Odyssey to purchase certain Defaulted Loans from the Trusts at below-market value and to control the purchase price and the sale process of loans pledged to the Indenture Trustee. The Odyssey Agreement authorizes Odyssey to purchase Defaulted Loans at a "purchase price" that is 10% less than fair market value of the Defaulted Loan, in other words, to retain a 10% commission for arranging for the sale of the Loan. OA § 2(C), J.A. 492–93.

The Trusts counter that Odyssey may only purchase Defaulted Loans from them in accord with mechanisms provided in the Basic Documents. They point to several sections of the Indentures to suggest the Basic Documents, including the Special Servicing Agreement, do allow the sale of loans. For example, Section 3.14 allows the Indenture Trustee to dispose of loans to three parties: a guarantor, a seller, and a servicer, J.A. 340, and loans sold to the Servicer must be at a "price equal to or in excess of the amount required by the applicable . . . Servicing Agreement," Indenture § 3.14(b), J.A. 340.

Contrast this with the Odyssey Agreement. For Odyssey to purchase Defaulted Loans from the Trusts, the latter must provide an Issuer Order to the Indenture Trustee directing the sale of the Loans to Odyssey, and that Order must state the purchase price. OA § 2.C, J.A. 492–93; Indenture, § 3.14, J.A. 340. The Indenture Trustee must acknowledge and sign the Order for the Loans to be sold to Odyssey. *Id*. This same mechanism is specifically provided in the Basic Documents. Moreover, the Trusts allege the Odyssey Agreement does not allow Defaulted Loans to be sold at below-market value and the Trusts cannot unilaterally set a purchase price, as the Indenture requires that the purchase price be equal to or in excess of the market value as determined in the Odyssey Agreement. However, that market value is

determined according to the methods provided in the Odyssey Agreement. It provides for two methods for calculating the market value, specifically: (i) the highest bid received from at least three qualified bidders when conducting the sale in a manner that will yield the "highest and best net proceeds to be paid" in exchange for the Loans; or (ii) the average value determined from the appraisal values of two reputable appraisers. OA § 2(C)(iii), J.A. 493.

Market value is thus ultimately determined by methods laid out in the Odyssey Agreement. They do not appear in the Basic Documents. Accordingly, the Odyssey Agreement supplemented the Basic Documents at least with respect to the methods for calculating market value of the Defaulted Loans Odyssey may purchase. This supplement was made without the consent of the Indenture Trustee or Noteholders, and thus it violates the Consent Clause.

We could end our analysis here, but we briefly consider several additional provisions of the Odyssey Agreement that modified the terms of the Basic Documents.[9]

---

[9] Appellants also argue that the PA Education Agency Servicing Agreement and the Special Servicing Agreement created an exclusive servicing arrangement for Defaulted Loans, which are now handled by U.S. Bank in its role as Successor Special Servicer, J.A. 958, and that the Odyssey Agreement modifies and violates this exclusive servicing arrangement by providing for Odyssey to service Defaulted Loans. This argument fails for the reasons discussed above in Section III.A.3.

### 3.    Indemnity Protection

The Odyssey Agreement also modifies indemnity protections related to servicing.  The Special Servicing Agreement provides that the Indenture Trustee and other parties shall be indemnified by the special servicer for liability arising from "willful misconduct, negligence or bad faith," SSA § 10, J.A. 441, whereas the Odyssey Agreement provides indemnification for only "willful misconduct, *gross* negligence or bad faith," O.A. § 9, J.A. 496 (emphasis added).

The District Court held that there is "no provision in the Indentures or in the [Special Servicing Agreement] [that] [provides] that every servicing agreement must mirror the others, ," *U.S. Nat'l Bank Ass'n*, 2018 WL 4462369, at *5, and the Trusts add that the existence of differing terms in the Odyssey Agreement and the Special Servicing Agreement does not mean the former modified the latter.

However, the question is not whether all servicing agreements must be identical.  Appellants have rights outlined in the Basic Documents as Indenture Trustee and Noteholders.  U.S. Bank as Indenture Trustee (not as servicer) has less indemnity protection under the terms of the Odyssey Agreement than under the terms of the Special Servicing Agreement.  This result also is a modification of the Special Servicing Agreement that was not consented to by the Indenture Trustee or the Noteholders.  It thus violates the Consent Clause.

### 4.    Removal of Servicer

As discussed in Section III.A.3 above, the Odyssey Agreement also modified the process by which a servicer could be removed.  Briefly, under the Special Servicing Agreement the Indenture Trustee "shall" remove the Successor Special

Servicer when certain defaults occur. SSA, § 6.D, J.A. 432–33. Odyssey, in contrast, cannot be removed for defaults under the Odyssey Agreement without consent of the Trusts. OA § 6(C), J.A. 494. Hence Section 6(C) of the Odyssey Agreement also modified the Special Servicing Agreement without consent of the required parties.[10]

---

[10] Appellants tell us that the Odyssey Agreement fails to satisfy the Indenture Rating Agency Condition and the Special Servicing Agreement Rating Agency Condition, effectively writing both provisions out of the Basic Documents and thus modifying them. The Trusts counter that they satisfied the Indenture Rating Agency Condition, *see* Indenture, Definitions, J.A. 414, when they provided the Rating Agencies with notice of their "intention to hire Odyssey as a Servicer" and sent them each a copy of the Odyssey Agreement. J.A. 844. None of the Rating Agencies sent written notice that the Agreement would result in a reduction or withdrawal of the rating of the Notes. As for the Special Servicing Agreement Rating Agency Condition, *see* SSA § 6(E), J.A. 433, the Trusts allege that it applies only to the "resignation or removal of the Special Servicer," J.A. 433, and that here the Trusts have not removed U.S. Bank as Special Servicer nor was Odyssey hired as a successor Special Servicer. The Trusts contend that Odyssey was appointed as an additional servicer for Defaulted Loans and they informed the Ratings Agencies as much. J.A. 873. But even assuming both Ratings Agency Conditions have been met, our conclusion remains unchanged—several provisions of the Odyssey Agreement violate the Granting Clause and the Consent Clause.

### 5.    Amendments

Amendments to the Special Servicing Agreement must be agreed to by parties other than the Trust, including the Special Servicer, Indenture Trustee, and the Administrator. SSA § 16, J.A. 442.  The Odyssey Agreement has no such provision and reserves for the Trusts the right to amend it.  OA § 15, J.A. 497.  This too is a modification inasmuch as it affects the rights of the Indenture Trustee and Noteholders *vis-a-vis* the servicer.[11]

### C.    The District Court Must Determine in the First Instance Whether the Odyssey Invoices Are Payable.

Because the District Court held that the Odyssey Agreement did not violate the Granting Clause or the Consent

---

[11] Because we hold that the Odyssey Agreement violated the Granting Clause and the Consent Clause, we need not decide whether the Agreement's formation was an arm's-length transaction or improper self-dealing.  We note, however, that the Indentures require the Trusts to "maintain an arm's length relationship with . . . any of the [Trusts'] Affiliates" and to preserve the lien of the Indentures.  Indenture § 3.23(l), (o), J.A. 346.  The Trust Agreements prohibit the Trusts from giving "the appearance [] of conducting business on behalf of any Owner or any Affiliate of an Owner."  TA § 2.03(b)(iv), J.A. 268.  VCG nonetheless stands on both sides of the Odyssey Agreement.  Its chairman signed VCG's letter (as an Owner of the Trusts) directing the Trusts to appoint Odyssey as servicer.  He also signed the Odyssey Agreement on behalf of Odyssey.  J.A. 500.  It is hard to see how such a transaction could be considered as conducted at arm's length.  *See LiquidX Inc. v. Brooklawn Capital, LLC*, 254 F. Supp. 3d 609, 618

Clause and was thus enforceable, it also ruled that Odyssey is entitled to payment for its invoices from the pledged assets of the Trusts. The Court had no opportunity to consider whether the invoices would be payable if the Odyssey Agreement were invalid and thus void. It will need to answer this question on remand.

Appellants maintain that, because the appointment of Odyssey was invalid, it was never an authorized servicer and has no right to any payment. However, because the District Court did not rule on this issue and the parties have not fully briefed it before us, we decline to decide in the first instance whether Odyssey's invoices are payable.

## CONCLUSION

Although the Odyssey Agreement does not violate the Granting Clause by appointing another servicer, it does violate it by assigning to the Owners of the Trusts several rights reserved for the Indenture Trustee, for the benefit of the Noteholders, in the Basic Documents. The Odyssey Agreement required the consent of the Indenture Trustee and Noteholders because it supplements and amends several provisions of the Basic Documents. Accordingly, the Odyssey Agreement is invalid and, if so, the Odyssey Invoices are likely

---

(S.D.N.Y. 2017) (holding that a transaction engineered "from both sides" cannot be at "arm's length"); *Roso v. Saxon Energy Corp.*, 758 F. Supp. 164, 169 (S.D.N.Y. 1991) (transaction where a party held "integral positions on both sides of the agreement" could not be "considered at arms-length"). It is true that the decision to hire Odyssey was not VCG's alone, but jointly VCG and Citibank's call. However, that other parties were involved does not resolve the problem of VCG being on both sides of the Agreement.

not payable.  We remand to the District Court to decide that issue in the first instance with the benefit of further briefing. Hence we affirm in part and reverse in part the rulings of the District Court.